# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

PROXENSE, LLC,

        Plaintiff,

    v.

GOOGLE LLC,

        Defendant.

Civil Action No. 6:23-cv-320

JURY TRIAL REQUESTED

## DEFENDANT GOOGLE LLC'S OPENING CLAIM CONSTRUCTION BRIEF

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.  Introduction ................................................................................................................1

II.  Background ................................................................................................................2

III.  Level of Skill in the Art .........................................................................................3

IV.  Undisputed Terms ...................................................................................................3

V.  Disputed Terms .........................................................................................................4

    A.  Device ID Patents .............................................................................................4

        1.  "integrated device" ('730 claims 1, 15) .......................................................4

        2.  "persistently storing … a plurality of codes and other data values comprising a device ID code … and a secret decryption value" ('730 claim 1, 15; '954 claim 1, 22) ...........................................................9

        3.  "access message" terms ('730 claims 1, 15; '954 claim 1, 22; '905 claim 1, 13) ...............................................................................................11

        4.  "The method of claim 1, wherein the biometric data and the scan data are both based on a fingerprint scan by the user." ('730 claim 5) .............................................................................................................13

    B.  Hybrid Device Patents .....................................................................................18

        1.  "receiver-decoder circuit" ('042 claim 10; '289 claim 14).......................18

        2.  "personal digital key" ('042 claim 10; '289 claim 14) .............................19

VI.  CONCLUSION........................................................................................................21

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Anderson*,
    471 F.2d 1237 (C.C.P.A.1973) ..................................................................................7

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004) ...............................................................................18

*Dart Indus., Inc. v. Banner*,
    636 F.2d 684 (D.C. Cir. 1980) ...............................................................................7, 8

*Goldenberg v. Cytogen, Inc.*,
    373 F.3d 1158 (Fed. Cir. 2004) .................................................................................8

*Ingevity Corp. v. BASF Corp.*,
    No. 18-CV-1391-RGA, 2019 WL 2356978 (D. Del. June 4, 2019) .........................6

*IQASR LLC v. Wendt Corp.*,
    825 F. App'x 900 (Fed. Cir. 2020) ........................................................................4, 6

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
    933 F.3d 1345 (Fed. Cir. 2019) .............................................................................4, 5

*Litton Sys., Inc. v. Whirlpool Corp.*,
    728 F.2d 1423 (Fed. Cir. 1984) .................................................................................8

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
    831 F.3d 1350 (Fed. Cir. 2016) .........................................................................13, 16

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ..............................................................................................9, 10

*In re Oda*,
    443 F.2d 1200 (C.C.P.A.1971) .................................................................................7

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...............................................................................19

*Proxense, LLC v. Samsung Elecs. Co., Ltd.*,
    No. 6:21-cv-210-ADA (W.D. Tex.) ..........................................................................2

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015) ...........................................................................10, 11

*TMI Prod., Inc. v. Rosen Ent. Sys., L.P.*,
    610 F. App'x 968 (Fed. Cir. 2015) ...........................................................................20

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ...............................................................................15

*TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*,
    264 F.3d 1111 (Fed. Cir. 2001)........................................................................................8

*WSOU Investments LLC v. Google LLC*,
    Nos. 2022-1066 & 2022-1067, 2023 WL 6210607 (Fed. Cir. Sept. 25, 2023) ...........15

*WSOU Invs., LLC v. Google LLC*,
    No. 6:20-CV-00571-ADA, 2021 WL 11745550 (W.D. Tex. June 2, 2021)
    (Albright, J.), aff'd, No. 2022-1066, 2023 WL 6210607 (Fed. Cir. Sept. 25, 2023) ...................17

## **Statutes**

35 U.S.C. § 112, ¶ 4 ..............................................................................................................13, 16

## **Other Authorities**

U.S. Patent No. 8,352,730.........................................1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18

U.S. Patent No. 8,646,042.................................................................................1, 3, 18, 19, 20, 21

U.S. Patent No. 8,886,954.......................................................................................1, 3, 6, 7, 8, 10, 12

U.S. Patent No. 9,679,289.....................................................................................1, 3, 19, 20, 21

U.S. Patent No. 9,928,905......................................................................................1, 2, 3, 8, 12

U.S. Patent No. 10,073,960.................................................................................................1, 3

Defendant Google LLC ("Google) respectfully submits this Opening Claim Construction Brief for U.S. Patent No. 8,352,730 ("'730 patent"), U.S. Patent No. 8,886,954 ("'954 patent"), U.S. Patent No. 9,928,905 ("'905 patent"), U.S. Patent No. 8,646,042 ("'042 patent"), U.S. Patent No. 9,679,289 ("'289 patent"), and U.S. Patent No. 10,073,960 ("'960 patent") asserted by Plaintiff Proxense, LLC ("Proxense") in the above-captioned action.

## I.    INTRODUCTION

In all, there are six disputed terms that fall into two categories.  First, there are three terms (*i.e.*, "integrated device," "plurality of codes and other data values," and the "fingerprint" limitation in a dependent claim of the '730 patent) that are indefinite because they fail to inform those of ordinary skill of the scope of the alleged inventions.  The term "integrated device" is a coined term with no plain meaning, and the specification of the '730 patent provides no guidance regarding the meaning of that term.  This is confirmed by the fact that Proxense added an express definition for "integrated device" to the specifications of subsequent applications purporting to claim the benefit of the '730 patent.  But this definition is absent from the '730 patent, rendering "integrated device" indefinite in the claims of that patent, where the term is not defined.  Next, the phrase "plurality of codes and other data values" is susceptible to at least four different interpretations, each requiring different sets of data to be stored.  Accordingly, this phrase too is indefinite because it fails to inform those of ordinary skill of the scope of the alleged invention and fails to put the public on notice of what would constitute infringement.  Finally, dependent claim 5 of the '730 patent purports to narrow the "biometric data" from claim 1, but instead introduces language that conflicts with the plain meaning of claim 1.  Because the claim is internally inconsistent and irreconcilable, it is indefinite.

Second, there are three terms (*i.e.*, the "access message" terms, "receiver-decoder circuit," and "personal digital key") that were previously construed by the Court, at least in part, and Google

herein proposes only minor revisions or additions to ensure the Court's constructions align with the plain meaning of the language of the claims asserted here.

## II.    BACKGROUND

The asserted patents belong to two different, purported patent families.[1]  The '954 and '905 patents claim priority to the non-provisional application for the '730 patent filed December 20, 2005, as well as to two provisional applications, Nos. 60/637,538 ("'765 Prov. Appl.") filed December 20, 2004, and 60/652,765 ("'765 Prov. Appl.") filed February 14, 2005.  The '730, '954, and '905 patents are collectively referred to herein as the "Device ID patents."

The '042, '289, and '960 patents all claim priority to a non-provisional application filed December 5, 2008, and provisional application No. 60/992,953 filed December 6, 2007.  The '042, '289, and '960 patents are collectively referred to herein as the "Hybrid Device patents."

Members of both the Device ID and Hybrid Device patent families, including the '730 and '905 patents, were previously construed by the Court in *Proxense, LLC v. Samsung Elecs. Co., Ltd.*, No. 6:21-cv-210-ADA (W.D. Tex.) ("the *Samsung* case") in Dkt. 43 ("Order") and Dkt. 149 ("Memorandum in Support of Claim Construction Order").[2]

In ***this*** litigation, Proxense is asserting a limited set of claims from different members of the same previously-asserted patent families:

| Patent Family | Patent | Claims (independent claims emphasized) |
|---|---|---|
| Device ID Patents | '730 Patent | **1**, 2-3, 5, **15**, 16-17 |

---

[1]  As addressed below, while the '954 and '905 patents purport to be continuations of the '730 patent, and thus are part of the same purported patent family, the applications for the '954 and '905 patents add new matter not present in the '730 patent, and thus the '954 and '905 patents' cannot be continuations of the '730 patent.

[2]  In the *Samsung* case, the asserted Device ID patents were the '730 patent, the '905 patent, and U.S. Pat. No. 10,698,989, and the asserted Hybrid Device patents were U.S. Pat. Nos. 9,049,188 and 9,235,700.

| | | |
|---|---|---|
| | '954 Patent | **1**, 2-3, 5-7, **22**, 23-27 |
| | '905 Patent | **1**, 2, 4-5, 7, **13**[3] |
| Hybrid Device Patents | '042 Patent | **10**[4] |
| | '289 Patent | **14**, 16 |
| | '960 Patent | **14**, 16 |

## III.   LEVEL OF SKILL IN THE ART

Google submits that a person of ordinary skill in the art would have had at least a B.S. in computer or electrical engineering, or equivalent, and at least three years of experience in the field of encryption and security or equivalent experience. More education could substitute for less experience, and vice-versa.  Black Decl. ¶ 17.

## IV.   UNDISPUTED TERMS

The parties have agreed to the following constructions entered in the *Samsung* case:

| Term | Agreed Construction |
|---|---|
| "device ID code" / "ID code" ('730 claims 1, 15; '954 claims 1, 22; '905 claim 1, 13) | "a unique code identifying a device" |
| "access message" ('730 claims 1, 15; '954 claims 1, 22; '905 claim 1, 13) | "a signal or notification enabling or announcing access" |
| "persistently storing . . . a tamper proof format written to a storage element on the integrated device that is unable to be subsequently altered" ('730 claims 1, 15) | No construction necessary |
| "hybrid device" ('042 claim 10; '289 claim 14) | "A device comprising an integrated personal digital key (PDK) and an integrated receiver-decoder circuit" |
| "enablement signal" ('042 claim 10; '289 claim 14; '960 claim 14) | No construction necessary |

---

[3]  Proxense's cover pleadings to its infringement contentions identify dependent claim 15, but the accompanying claim chart is based on the language of independent claim 13.  Google therefore understands claim 13 of the '905 patent is asserted, not claim 15.

[4]  Proxense's complaint identifies claim 1 of the '042 patent, but Proxense's opposition to Google's motion to dismiss stated that this was "a typographical error" and that, consistent with its infringement contentions, Proxense intended to assert claim 10.  Dkt. 27 at 4 fn. 4.

## V.     DISPUTED TERMS

### A.     Device ID Patents

#### 1.     "integrated device" ('730 claims 1, 15)

| Term | Google's Construction | Proxense's Construction |
|------|----------------------|------------------------|
| "integrated device" | Indefinite | No construction necessary |

"[I]ntegrated device" is "a coined term, meaning it has no ordinary and customary meaning," and thus "the question is whether the intrinsic evidence provides objective boundaries to the scope of the term." *See Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1353 (Fed. Cir. 2019). Here, neither the claim language nor other intrinsic evidence defines the scope of the claimed "integrated device," leaving undefined what types of devices are authenticated by the method and system of claims 1 and 15 of the '730 patent and thereby rendering those claims indefinite. *See, e.g., IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 908 (Fed. Cir. 2020) (finding a "magnetic fuzz" claim term was indefinite because "'patent fails to offer any meaningful and functional explanation' of the definitional characteristics of 'magnetic fuzz'").

The two asserted independent claims of the '730 patent are directed to methods and systems for authenticating an "integrated device." '730 patent, claims 1 and 15. Asserted method claim 1 requires storing a "device ID code uniquely identifying the integrated device" and "a third-party trusted authority possessing a list of device ID codes uniquely identifying legitimate integrated devices." Asserted system claim 15 refers to "a device ID code uniquely identifying [a] biometric key" but then requires a "third-party trusted authority possessing a list of device ID codes uniquely identifying legitimate integrated devices."

As explained by Google's expert, Dr. John Black, the term "integrated device" is not a known term used in connection with computer technology and lacks any ordinary or customary meaning. Black Decl. ¶ 20. Dr. Black's survey of nine computer dictionaries did not identify a

single definition for "integrated device."  *Id.* ¶¶ 21-22.

The constituent words of "integrated device" also fail to inform one of ordinary skill regarding the scope of this claim term.  For example, in asserted method claim 1, the term dictates that the claimed "device" being "authenticated" via the claimed method must be "integrated," but other than indicating that the "integrated device" includes "a storage element," the language of method claim 1 fails to define what it means for a device to be "integrated," including whether it is the device itself that is "integrated" into a system or it is individual components that are "integrated" into the device, or anything about the nature or number of components that must be included in a device for it to qualify as an "integrated device."  Black Decl. ¶¶ 23-24.  Asserted system claim 15 fares even worse, since it refers to "a biometric key," yet does not identify whether that alone is an example of the claimed "legitimate integrated devices," or what else would be required for such key to qualify as an "integrated device" (*e.g.*, whether there is a particular arrangement of components within the key that must be "integrated" and/or whether there must be other system components in addition to that "biometric key" for it to qualify as an "integrated device").  *Id.* ¶ 25.

Nor does "the intrinsic evidence provide[] objective boundaries to the scope of the term."  *See Iridescent*, 933 F.3d at 1353.  Indeed, the specification of the '730 patent provides ***no guidance whatsoever*** on the scope of the claimed "integrated device."  The term is found only in the abstract, which merely parrots the claim language.  '730 patent at Abstract.  None of the figures in the specification, including Figures 1 and 2 showing a "Biometric Key," are ever described as including an "integrated device."  The specification incorporates by reference the provisional applications, but those provisional applications also ***never*** use the term "integrated device," instead at most referring to "integrated biometric readers/scanners" found in a "Bio Key."  Ex. 1 at 6; Ex.

2 at 5.  In sum, neither the '730 patent nor any of its predecessor applications describes, or provides any guidance regarding the scope of, the claimed "integrated device."  Black Decl. ¶¶ 26-27.

Accordingly, a POSITA reading the claim language and other intrinsic evidence is left without reasonable certainty as to whether the claimed "integrated device" refers to just a "Biometric Key" (due to its inclusion of "integrated biometric readers/scanners"), a device with a "Biometric Key," or a device with a "Biometric Key" and other components.  Nor can Proxense argue that the claim is broad enough to support all of the foregoing possibilities, because any such assertion leaves unanswered the fundamental question: what does it mean for the device to be an "integrated device" and what must be "integrated" for a device to become an integrated device? Because the intrinsic evidence fails to define the scope of the coined "integrated device" term, the asserted claims of the '730 patent reciting the same are indefinite.  *See IQASR*, 825 F. App'x at 908; *see also Ingevity Corp. v. BASF Corp.*, No. 18-CV-1391-RGA, 2019 WL 2356978, at *4 (D. Del. June 4, 2019) (finding "incremental adsorption capacity" indefinite as "it is neither a term of art nor defined by the patentee," and a POSITA would need to select between multiple methods of measuring "adsorption capacity").

Subsequent developments in the purported Device ID patent family confirm the indefiniteness of the "integrated device" term in the '730 patent claims.  When Proxense filed the first purported continuation application from the '730 patent application, which matured into the '954 patent, it added an express definition for "integrated device" and a list of exemplary devices that qualify as an "integrated device"—none of which appears in the '730 patent:

> In one embodiment, the biometric key 100 is integrated into another
> object or device. A device having an integrated biometric key 100 is
> occasionally referred to herein as an "integrated device." For
> example, in one embodiment, the biometric key 100 is integrated
> into a mobile phone (e.g. a cellular phone or smartphone), tablet,
> laptop, mp3 player, mobile gaming device, watch, key fob or other

mobile device, thereby making the biometric key 100 unobtrusive
to carry.

'954 patent at 4:6-14.  Thus, in later patent applications, Proxense deemed it necessary to define

"integrated device" as a device (*e.g.*, a cellular phone) "having an integrated biometric key."  Yet

none of that discussion is found anywhere in the '730 patent or either of its provisional

applications.

By adding a written description of what constitutes an "integrated device" to the '954

patent application and its progeny, Proxense introduced new matter that is not part of the '730

patent.  *See, e.g.*, *Dart Indus., Inc. v. Banner*, 636 F.2d 684, 688 (D.C. Cir. 1980) ("An addition to

a patent specification constitutes 'new matter' when it changes the invention disclosed or

introduces a concept not previously present in that specification.") (citing *In re Anderson*, 471 F.2d

1237, 1244 (C.C.P.A.1973); *In re Oda*, 443 F.2d 1200, 1203-05 & n.2 (C.C.P.A.1971)).

Proxense's addition of new matter only confirms that the "integrated device" recited in the '730

patent claims was inadequately defined in the '730 patent specification, such that a POSITA would

be unable to ascertain its scope.  Proxense tacitly recognized this deficiency and surreptitiously

sought to correct it in its subsequent application by adding a new definition, without alerting the

USPTO to the addition of new matter.  Ex. 3 at 48 (application data sheet for '954 patent

application, claiming it is a "continuation" '730 patent application); Ex. 3 at 13-14 (paragraph

[0025] of originally filed application for '954 patent containing new matter relative to '730 patent

application without any indication that it is new).

This addition of new matter in subsequent patents, however, cannot cure the indefiniteness

of the earlier-filed '730 patent claims, which issued without the benefit of Proxense's belated

attempt at lexicography.  Not only did the subsequent '954 and '905 patents add a new definition

of "integrated device," these later patents disclosed and claimed an "integrated device" that

"comprises one or more of a mobile phone, tablet, laptop, mp3 player, mobile gaming device, watch and a key fob" ('954 patent at 4:10-14; '954 patent claims 6, 25; '905 patent claims 5, 12, 15), whereas the '730 patent only disclosed that "biometric key 100 comprises a modified key fob" ('730 patent at 3:53-54).  *See* Ex. 4 at 5 (redline comparison of '954 patent to originally-filed non-provisional application for the '730 patent); *see also Dart Indus.*, 636 F.2d at 688.[5]

The fact that these later patents disclosed and claimed embodiments ("a mobile phone, tablet, laptop, mp3 player, mobile gaming device, watch") not found in the '730 patent only confirms that they added new matter. *See TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1119 (Fed. Cir. 2001) (finding claims improperly added new matter where the original disclosure was "completely lacking in any description" of the embodiment described in the claims).  That fact has two consequences.  First, because the '954 and '905 patents added new matter, they cannot be "continuations" of the '730 patent, which is the only relationship Proxense ever identified between the '730, '954, and '905 patent.  *See Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1437–38 (Fed. Cir. 1984).  Second, even if Proxense were to argue that the '954 and '905 patents are continuations-in-part of the '730 patent, the newly added definition of "integrated device" cannot be used to interpret the undefined "integrated device" term found in the earlier-filed '730 patent claims.  Indeed, the Federal Circuit has made clear that "new matter added by the [] continuation-in-part application" is "not part of the intrinsic evidence" of a patent at issue and, therefore, such new matter "is not available to construe the claims" of the patent at issue.  *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1168 (Fed. Cir. 2004).

---

[5]   The '954 and '905 patent also added new matter in the form of disclosure and claims specifying that the application to which access is controlled can be "a financial account (e.g. a savings account, checking account, brokerage account, credit card account, credit line, etc.)" or "medical information such as a medical record, insurance information or other healthcare information."  '954 patent at 6:22-26; '905 patent at 6:24-28; *see also* Ex. 4 at 8.

Thus, the asserted '730 patent claims are invalid as indefinite.

> **2.** **"persistently storing … a plurality of codes and other data values comprising a device ID code … and a secret decryption value" ('730 claim 1, 15; '954 claim 1, 22)**

| Term | Google's Construction | Proxense's Construction |
|---|---|---|
| "persistently storing … a plurality of codes and other data values comprising a device ID code … and a secret decryption value" | Indefinite | No construction necessary |

The asserted claims of the '730 and '954 patents require "persistently storing … a plurality of codes and other data values comprising a device ID code … and a secret decryption value." This claim language does not clearly delineate the scope of the claimed subject matter, leaving the scope of the claims unclear. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909 (2014) ("[A] patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'"). Indeed, the language is susceptible to at least four different interpretations—as shown through the use of parentheses to group different terms together and thereby change the interpretation—each resulting in different claim scope:

1. ***"(plurality of (codes and other data values)) comprising (a device ID code and a secret decryption value)":*** Under this interpretation, the claims require a plurality of elements, and each of those elements can be either a "code" or an "other data value." Just storing **one** "device ID code" and **one** "secret decryption value" would meet this limitation.

2. ***"((plurality of codes) and (other data values)) comprising (a device ID code and a secret decryption value)":*** Under this interpretation, the claims require a plurality of code, and also require "other data values." Because each of those terms is plurality, storing a single "device ID code" and a single "secret decryption value" would be required to meet the limitation, but not sufficient. Instead, you would need to store at least **two** codes and at

least **two** values to meet the claim language.

3. **"(plurality of codes) and (other data values comprising a device ID code) and (a secret decryption value)":** Since the specification teaches that a single "code" can be one or more "values" ('730 Patent at 7:24-31), the limitation can also be interpreted to require storing three different types of codes/values: (1) a plurality of codes; (2) other data values comprising a device ID code; and (3) a secret decryption value.  Under this interpretation, you would need to store at least **three** codes (two due to "plurality of codes" requirement; and one more due to the separate "device ID code requirement") and at least **one** value to meet the claim language.

4. **"((plurality of (codes and other data values)) comprising a device ID code) and (a secret decryption value)":** Under this interpretation, the "plurality of codes and other data values" include the claimed "device ID code," while the "secret decryption value" is a separate requirement.  To meet the limitation would thus require storing at least **two** codes and at least **one** value.

Because the asserted '730 and '954 patent claims and their specifications fail to specify with reasonable certainty the scope of the "persistently storing" limitation—including the number and nature of codes and values that must be stored—these claims are indefinite. The Federal Circuit has found a claim indefinite where a POSITA would have multiple interpretations of the same term. For example, in *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, the court determined that the term "molecular weight" could be understood to cover three different measurements – $M_p$, $M_n$, or $M_w$ – and the claims "[did] not indicate which measure to use." 789 F.3d 1335, 1344-45 (Fed. Cir. 2015).  As a result, the Federal Circuit determined that the patentee "failed to inform with reasonable certainty those skilled in the art about the scope of the invention."  The same logic

applies here, where the term "persistently storing … a plurality of codes and other data values comprising a device ID code … and a secret decryption value" is susceptible to multiple interpretations and leaves a POSITA guessing as to the scope of the claim.

### 3. "access message" terms ('730 claims 1, 15; '954 claim 1, 22; '905 claim 1, 13)

| Term | Google's Construction | Proxense's Construction |
|---|---|---|
| "an access message … [allowing / allows] the user [access to / to access] an application" ('730 claims 1, 15; '954 claim 1, 22) | "a signal or notification allowing the user to access an application" | No construction necessary beyond adopting the Court's previous construction of "access message" |
| "an access message … [allowing / allows] the user to complete a financial transaction ('905 claim 1, 13) | "a signal or notification allowing the user to complete a financial transaction" | No construction necessary beyond adopting the Court's previous construction of "access message" |

This Court previously construed the term "access message" as "a signal or notification enabling or announcing access."  Google is not challenging the Court's holding that an "access message," in the abstract, is not limited to just "enabling" access and can include "announcing" access.  However, this construction leaves the impression that the "access message," ***as specifically used in the asserted claims***, may be used merely as notification that a user (previously) accessed an application or completed a financial transaction.  Such an interpretation of the claims would be incorrect and conflict with the plain meaning of the remaining claim language and, as such, Google's clarifications are necessary to avoid an improper application to the claims.

Specifically, the remaining claim language is clear that any "signal or notification" must do more to meet the claims than just "announc[e]" prior access; it must "allow" the user "to access an application" or "to complete a financial transaction":

- '730 patent claim 1: "receiving an ==access message== from the agent ==allowing the user access to an application==;"

- '730 patent claim 15: "receiving an access message from the agent allowing the user to access an application;"

- '954 patent claim 1: "receiving, at an application, an access message from the trusted authority … allowing the user access to the application;"

- '954 patent claim 22: "receives an access message from the trusted authority … and allows the user to access an application;"

- '905 patent claim 1: "responsive to receiving an access message from the third-party trusted authority …, allowing the user to complete a financial transaction;" and

- '905 patent claim 13: "receives an access message from the third-party trusted authority … and allows the user to complete a financial transaction."

Google's proposal thus starts with the agreed construction of "access message" (specifically, that it is a "signal or notification") and places that language in the context of the broader claim limitation (specifically, "allowing" "the user access to an application" or "to complete a financial transaction") without deviating from the plain meaning of either.  In contrast, not construing the larger terms leaves the incorrect impression that the claimed "access message" is used to "announc[e] access," when that is clearly not what is required by the remaining claim language.  Proxense has already sought to exploit this ambiguity at least in the context of the '730 patent, with one of its infringement theories for the "receiving an access message from the agent allowing the user access to an application" being that "[a]fter the purchase has been authorized, Android devices … receive a push notification with details of the transaction."  Ex. 5 at 11-12.  This theory ignores the claim language that the "access message" must also "allow[] the user to access an application."  Accordingly, Google's construction cures any ambiguities that Proxense

may create by relying on the Court's construction of "access message" while ignoring the surrounding claim language.

> **4.** **"The method of claim 1, wherein the biometric data and the scan data are both based on a fingerprint scan by the user." ('730 claim 5)**

| Term | Google's Construction | Proxense's Construction |
|------|----------------------|------------------------|
| "The method of claim 1, wherein the biometric data and the scan data are both based on a fingerprint scan by the user." | Indefinite or invalid under 35 U.S.C. § 112, ¶ 4<br><br>alternatively:<br><br>"wherein the biometric data and the scan data of claim 1 consists of a single fingerprint" | No construction necessary |

The term "[t]he method of claim 1, wherein the biometric data and the scan data are both based on a fingerprint scan by the user" is indefinite and invalid under 35 U.S.C. § 112, ¶ 4 because the claim term is fundamentally inconsistent with the "biometric data" of independent claim 1 of the '730 patent.

Claim 1 requires storing "biometric data" and comparing it to "scan data from *a biometric scan*" to perform "biometric verification of the user."  Claim 1 further defines that "*the biometric data* is *selected from a group consisting of* a palm print, a retinal scan, an iris scan, a hand geometry, a facial recognition, a signature recognition and a voice recognition."  The "fingerprint" scan recited in claim 5 is not one of the enumerated options.  The use of the claim language "selected from a group consisting of" indicates that this is not an open-ended group permitting other types of scans; rather, the scans specifically enumerated in claim 1 are the *only* possible options.  *See Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350,

1359 (Fed. Cir. 2016) (holding there is an "exceptionally strong presumption that a claim term set off with 'consisting of' is closed to unrecited elements").[6]

Despite this, claim 5 specifies that the "the biometric data and the scan data are both based on *a fingerprint scan*," which is not one of enumerated options in claim 1 from which claim 5 depends. Indeed, the specification defines "fingerprint scan" as a ***different and separate embodiment*** from the use of the biometric types enumerated in claim 1—i.e., "a palm print, a retinal scan, an iris scan, a hand geometry, a facial recognition, a signature recognition and a voice recognition":

> Although *the embodiments below* are described using the example of biometric verification *using a fingerprint*, *other embodiments* within the spirit of the present invention can perform biometric verification *using other types of biometric data*. For example, the biometric data can *include a palm print, a retinal scan, an iris scan, hand geometry recognition, facial recognition, signature recognition, or voice recognition*.

'730 patent at 3:4-11. Other disclosures are entirely consistent with distinguishing between fingerprint and palmprint. Figure 2, for example, shows a "biometric key" capable of scanning a single "thumb or other finger," but is purposely designed with "a small form factor (e.g., the size of a [sic] automobile remote control)" ('730 patent at 3:17-20, 3:29-33), preventing it from being used to scan "a palm print" or "hand geometry." There is also no disclosure that the embodiment of Figure 2 includes a camera or microphone, or that it is otherwise capable of performing "a retinal scan, an iris scan, … facial recognition, signature recognition, or voice recognition."

---

[6]  Moreover, nothing in the intrinsic record supports a finding that this "strong presumption" does not apply here. For example, and as addressed in more detail below, a fingerprint scan does not overlap with any of these group members and is described in the specification as a separate embodiment.

This distinction between embodiments using a fingerprint scan versus other types of scans was also reflected during prosecution of the '730 patent.  The pending application included separate dependent claims directed to each of these two separate embodiments, including pending claims 7 and 22.  Importantly, both of those claims depended from claim 1 directly, rather than then-pending claim 7 somehow further narrowing then-pending claim 22:

> 7.      (Original)  The method of claim 1, wherein the biometric data and the scan data are both based on a fingerprint scan by the user.

> 22.      (Previously Presented)  The method of claim 1, wherein the biometric data comprises one from a group of a palm print, a retinal scan, an iris scan, a hand geometry, a facial recognition, a signature recognition and a voice recognition.

Ex. 6 at 20, 23.  The Examiner then chose to incorporate the subject matter of the-pending claim 22 into independent claim 1, cancelling claim 22 in the process, while then-pending claim 7 subsequently issued as current claim 5.  *Id.* at 6-13.  The prosecution history thus shows that the subject matter incorporated into claim 1 was first introduced as separate dependent claim with no relation to then-pending claim 7 (now claim 5), and the Examiner's decision to incorporate this subject matter into claim 1 did not create a relationship to the "fingerprint scan" of claim 5 where there previously was none.

Accordingly, when read in light of claim 1, claim 5 is nonsensical because it seeks to add a requirement (that the "biometric data" be based on a "fingerprint scan") that is ***expressly excluded*** by claim 1 (where the "biometric data" is limited to a defined set that does not include a "fingerprint scan").  This inconsistency also independently renders claim 5 invalid as indefinite. *See Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1367 (Fed. Cir. 2016) ("The claims are nonsensical in the way a claim to extracting orange juice from apples would be, and are thus indefinite." (internal citation omitted)); *see also WSOU Investments LLC*

*v. Google LLC*, Nos. 2022-1066 & 2022-1067, 2023 WL 6210607 (Fed. Cir. Sept. 25, 2023) (affirming this Court's finding that plain meaning of claims was nonsensical and thus indefinite).

In addition, because claim 5 defines entirely different biometric data that is incompatible with the biometric data of claim 1, dependent claim 5 fails to "specify a further limitation of the subject matter claimed" in independent claim 1 and is thus invalid under 35 U.S.C. § 112 ¶ 4.  *See Multilayer*, 831 F.3d at 1362 ("Independent claim 1 excludes LDPE from the inner layers, while dependent claim 10 includes it. As such, claim 10 is inconsistent with claim 1 and, indeed, contradicts claim 1. A dependent claim that contradicts, rather than narrows, the claim from which it depends is invalid.").

This dispute was previously briefed in the *Samsung* case.  *Samsung* case, Dkt. 149 at 22-24.  There, the Court held that "[t]he plain and ordinary meaning of "palm print" would be understood to include some combination of prints from the heel and/or flat of the hand, with multiple fingerprints and/or a thumb print."  *Samsung* Case, Dkt. 149 at 24.  This is incorrect. First, as addressed above, the intrinsic evidence described and claimed systems and methods based on a "fingerprint scan" as a different and separate embodiment from use of other biometric scans, including of a "palm print."  Second, the palm and fingers are both part of the hand, but the fingers are not part of the palm.  *See* Ex. 7 (defining "palm" as "the somewhat concave part of the human hand between the bases of the fingers and the wrist or the corresponding part of the forefoot of a lower mammal").  The claim also references "hand geometry," but that too is different from a fingerprint: hand geometry looks to the outer shape of the hand, whereas a fingerprint scan analyzes the pattern of grooves on a finger.  *Compare* Ex. 8 (hand geometry "measur[es] and record[s] the length, width, thickness, and surface area of an individual's hand" with "a camera [that] capture[s] a silhouette image of the hand") *with* Ex. 9 (fingerprint scanning is based on "the

high, peaking portion of the friction ridge skin" and "valleys between these ridges" that are used to identify "the location and direction of the ridge endings and bifurcations (splits) along a ridge path").

The Court also deemed it persuasive that "an examiner would not introduce an indefinite term into a claim when he/she chooses to amend the claim for the very purpose of putting the application in a condition for allowance." *Id.* at 24.   But courts routinely invalidate claims deemed allowable by an Examiner, including for indefiniteness. *See WSOU Invs., LLC v. Google LLC*, No. 6:20-CV-00571-ADA, 2021 WL 11745550, at *1 (W.D. Tex. June 2, 2021) (Albright, J.), *aff'd*, No. 2022-1066, 2023 WL 6210607 (Fed. Cir. Sept. 25, 2023) (agreeing with district court's finding that claims were indefinite despite having been allowed by a PTO examiner because otherwise "no party could ever raise an indefiniteness challenge because every claim term ever held indefinite was originally approved by a patent examiner").   Here, the Examiner overlooked the effect an amendment to an independent claim had on a dependent claim.   Specifically, the Examiner proposed a number of amendments to put the claims in a condition of allowability, including incorporating the "consisting of" list from pending dependent claim 22 into claim 1, but the Examiner ***did not address*** pending claim 7 ('730 patent claim 5) in any way, despite claim 7 also standing rejected at the time of amendment.   Ex. 6 at 20.   Thus, prior to this amendment, the application provided two distinct, non-overlapping biometric choices: (1) the "consisting of" list of claim 22; and (2) the fingerprint option of claim 7.   After the amendment, due in part to the Examiner's failure to address claim 7, the claims inconsistently required both.   "[W]here as here, claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated."   *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

17

Alternatively, if the Court maintains the view that claim 5 is not indefinite, then Google respectfully requests that the Court's holding from the *Samsung* case be memorialized as reflected in Google's construction by specifying that "the biometric data and the scan data of claim 1 consists of a single fingerprint." *See Samsung* case, Dkt. 149 at 24 ("Claim 5 of the '730 Patent properly narrows the scope of 'biometric data' to a single 'fingerprint.'"); *see also id.* ("Claim 5 of the '730 Patent, therefore, properly narrows the scope of the 'biometric data' Markush group to a specific region of a palm print—a single 'fingerprint.'"). If Proxense is allowed to interpret claim 1 broadly to maintain the validity of claim 5, then Google is entitled to a construction it can use to explain to the jury that claim 1 is sufficiently broad to encompass "the biometric data and the scan data of claim 1 consist[ing] of a single fingerprint."

### B. Hybrid Device Patents

#### 1. "receiver-decoder circuit" ('042 claim 10; '289 claim 14)

| Term | Google's Construction | Proxense's Construction |
|------|----------------------|------------------------|
| "receiver-decoder circuit" | "a collection of circuit components capable of wirelessly receiving data in an encrypted format and decoding the encrypted data for processing" | "a component or collection of components, capable of wirelessly receiving data in an encrypted format and decoding the encrypted data for processing" |

The parties agree on the functions performed by the "receiver-decoder circuit." The only difference is that Google's proposed construction clarifies that a "receiver-decoder ***circuit***" is "a collection of ***circuit*** components" rather than any "component or collection of components." Neither "collection of circuit components" nor "component or collection of components" is found verbatim in the specification's definition of a "receiver-decoder circuit." *See* '042 patent at 7:10-13 ("The RDC 304 provides the wireless interface to the PDK 102. Generally, the RDC 304 wirelessly receives data from the PDK 102 in an encrypted format and decodes the encrypted data for processing by the processor 306."); '289 patent at 7:45-48 (same). However, the specification

is clear that an RDC is a "circuit" and "RDC 304" is also shown in Figure 3 as a physical "circuit" component alongside other indisputably physical components, such as "Processor 306" and "I/O Port 312." *See* '042 patent at Fig. 3; '289 patent at Fig. 3.  Thus, the intrinsic evidence supports Google's construction of a "receiver-decoder *circuit*" as "a collection of *circuit* components capable of wirelessly receiving data in an encrypted format and decoding the encrypted data for processing."  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) ("[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").

### 2.     "personal digital key" ('042 claim 10; '289 claim 14[7])

| Term | Google's Construction | Proxense's Construction |
|------|----------------------|------------------------|
| "personal digital key" | "a collection of circuit components that includes an antenna, a transceiver, and a controller and memory for storing information particular to a user" | "an operably connected collection of elements including an antenna and a transceiver for communicating with a RDC and a controller and memory for storing information particular to a user" |

Again, the parties' proposed constructions are virtually identical, with Google proposing only to minor modifications to the Court's prior construction of "personal digital key": (1) specifying (similar to Google's construction for "receiver-decoder circuit") that a "personal digital key" is "a collection of circuit components" rather than undefined "elements"; and (2) removing a

---

[7]   Claim 14 of the '289 patent does not, on its face, include the words "personal digital key," and instead just requires "an integrated receiver-decoder circuit (RDC) of a hybrid device."  The parties agree, however, that a "hybrid device" is "a device comprising an integrated personal digital key (PDK) and an integrated receiver-decoder circuit," as construed by the Court in the *Samsung* case.  Thus, claim 14 of the '289 patent does require a "personal digital key" via its "hybrid device" limitation and the Court's construction thereof.

confusing requirement that the "transceiver" is "for communicating with a RDC."   Both modifications are necessary in view of the intrinsic evidence.

*First*, Google's construction removes the phrase "for communicating with a RDC" from the description of the "transceiver" in the Court's prior construction in the *Samsung* case.   The asserted claims of the '042 and '289 patent already require "creating a first wireless link between an integrated receiver-decoder circuit (RDC) of a hybrid device and an external personal digital key (PDK)."   Including "for communicating with a RDC" in the construction of "personal digital key" renders the express requirement of "creating a first wireless link" redundant, which is disfavored.   *See TMI Prod., Inc. v. Rosen Ent. Sys., L.P.*, 610 F. App'x 968, 972 (Fed. Cir. 2015) (refusing to adopt construction that would render another limitation redundant).   Further, removing "for communicating with a RDC" renders the construction of "personal digital key" consistent with the agreed portion of the construction for "receiver-decoder circuit."   For "receiver-decoder circuit," the specification identifies a "wireless interface *to the PDK*" ('042 patent at 7:10-11), yet the agreed portion of the construction only requires a "wireless interface" without repeating the "to the PDK" language from the specification.   For "personal digital key," too, the Court's construction should just require a "transceiver" without repeating the "for communicating with a RDC" language from the specification.   After all, the claims already require "an integrated PDK," an "external PDK," an "internal RDC," and "an external RDC."   '042 patent claim 10; '289 patent claim 14.   Introducing additional references to PDKs and RDKs beyond those expressly required by the claim language only injects confusion.

*Second*, similar to the "receiver-decoder circuit" term, Google proposes construing the personal digital key as "a collection of circuit components" rather than "an operably connected collection of elements."   This would conform the construction of "personal digital key" with

Google's construction of "receiver-decoder circuit"—both are circuits in a hybrid device. As with "receiver-decoder circuit," the specification's definition of a "personal digital key" does not verbatim use the phrase "collection of circuit components" or "collection of elements." *See* '042 patent at 13:46-49 ("In a minimal embodiment, the PDK 102a includes an antenna and a transceiver for communicating with a RDC (not shown) and a controller and memory for storing information particular to a user."); '289 patent at 14:20-23 (same). But the components listed in both the specification and the agreed portion of the construction (antenna, transceiver, controller, and memory) are ***all physical circuit components***. To avoid confusion, this should also be reflected in the Court's construction of "personal digital key" as being a "collection of circuit components," as reflected in Google's proposal. *See supra* sec.V.B.1.

Accordingly, the Court should construe the term "personal digital key" as "a collection of circuit components that includes an antenna, a transceiver, and a controller and memory for storing information particular to a user."

## VI.    CONCLUSION

Based on the foregoing, Google respectfully requests that the Court adopt Google's proposed constructions.

Dated:  November 6, 2023

*/s/ Kevin Hardy_____*
G. Blake Thompson
State Bar No. 24042033
Blake@TheMannFirm.com
J. Mark Mann
State Bar No. 12926150
Mark@TheMannFirm.com
MANN | TINDEL | THOMPSON
112 E. Line Street, Suite 304 Tyler, Texas 75702
(903) 657-8540
(903) 657-6003 (fax)

Kevin Hardy
kevinhardy@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Sean Pak (*pro hac vice*)
seanpak@quinnemanuel.com
Iman Lorgooei (*pro hac vice*)
imanlorgooei@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

John McKee (*pro hac vice*)
johnmckee@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Counsel for Defendant Google LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of November, 2023, I served the foregoing

electronically to all counsel of record.


*/s/ Ognjen Zivojnovic*
Ognjen Zivojnovic